**STATE of Missouri, Respondent,**

v.

**Melvin Lee REYNOLDS, Appellant.**

**No. 61927.**

Supreme Court of Missouri, Division No. 1.

July 14, 1981.

Rehearing Denied Sept. 8, 1981.

Lee M. Nation, Kansas City, for appellant.

Thomas G. Auffenberg, Asst. Atty. Gen., Jefferson City, for respondent.

STOCKARD, Commissioner.

Melvin Lee Reynolds was found guilty by a jury of murder in the second degree of Eric Scott Christgen, a four-year-old child, and sentenced to life imprisonment. He has appealed from the ensuing judgment.

Appellant does not challenge the sufficiency of the evidence. Therefore, we shall not set forth the sordid details of the crime. A jury reasonably could find that on May 26, 1978 appellant enticed Eric Christgen from a shopping mall in St. Joseph, Missouri, took him to a wooded area, and while sexually molesting him caused his death from asphyxiation or suffocation.

By his first point appellant asserts that the trial court erred in failing to sustain his motion to suppress statements made by him "insofar as the evidence showed that said statements were the fruit of an unlawful arrest, were involuntary, and thus unconstitutionally obtained."

The statements, which constitute a confession, were made during an interrogation of appellant by police officers and are contained on cassette tapes which have been filed with this Court.

Following the homicide the police started an extensive investigation, and in following up 231 "leads," many of which were received by telephone, 450 persons were interviewed. The police were aware that appellant had previously been involved in a sexual attack on a nephew of his, and on June 2 an unidentified person called the police and reported that he had seen appellant on the shopping mall the day that Eric Christgen had disappeared. Two officers were assigned to "interview [him] as a witness," which lasted about fifteen minutes. In that interview appellant denied that he was on the mall on May 26. On the morning of June 3, the police reviewed the information received the previous day from all sources, and because appellant had denied he was at the mall on May 26, he was again interviewed. What was learned at that interview, if anything, is not shown by the record except he then admitted he previously had lied and that he was on the mall on May 26. On June 3 he was given a polygraph test, the results of which are not shown in the record. There is nothing to indicate that appellant did not voluntarily submit to the test or that he did not cooperate fully. In any event it is not the subject of any challenge on this appeal. In the early part of August, Officer Robert E. Anderson, a sergeant with the Missouri Highway Patrol, interviewed appellant after reading to him the "*Miranda*" rights. Appellant stated that on May 26 he had borrowed an automobile from Frances Pierce and had done some washing for her. He stated that he parked the car and walked to the corner of 5th and Felix Streets where he remained for about thirty minutes. He then paid a telephone bill for her and walked to the Methodist Hospital to visit Mrs. Pierce who was a patient there. Mrs. Pierce was later interviewed by the police as well as other persons named by appellant, and what they said "did not coincide" with what appellant had related.

On December 23, 1978, appellant was again interviewed by Sergeant Anderson, and was then given sodium amytal at St. Joseph Hospital. There is no contention that this was not with appellant's approval, or that he did not fully understand what was being done. He denied having anything to do with the death of Eric Christgen, but while he was under the influence of sodium amytal he again related to the police officers his activities on May 26, 1978, and at one point stated: "Before I killed— Before I went to the unemployment office."

On February 14, 1979, Officer Muehlenbacher called appellant by telephone at his home and stated that the police would like to talk to him again. He readily agreed and Officers Anderson and Muehlenbacher picked him up and took him to the State Highway Patrol headquarters. When they approached the building appellant said, "I am glad you brought me out to the High-

way Patrol Headquarters." I "don't like the police station." After the "*Miranda*" rights were again read to him and he signed a copy, appellant indicated a willingness to talk to the officers. Sergeant Anderson then went over with him "in great detail" his previous statements, and told him the results of the investigation by the police which were inconsistent with what appellant had previously told them. Appellant then said, "[t]hose past statements that I have given to you were not the truth." When asked why he had lied, he answered, "I was afraid you was going to pin this on me and I was scared." The officers and appellant then took a break, appellant used the restroom, and he was given some coffee. They then talked in "generalities" and he told the officers about a girlfriend that he really liked. Detective Jones joined Officers Anderson and Muehlenbacher and they again went over with appellant what he had told them, and appellant asked, "Do you think I'll go to the penitentiary?" Officer Anderson said he did not know, but asked him if he thought he should, and appellant replied, "No, I think I need help at the State Hospital, I don't think I need to go the penitentiary." The officer then asked appellant if he was willing to talk and "get this off your chest, tell us what really happened." Appellant said it was "awfully hard to talk about it," and asked if he had to talk to all three of the officers. Officer Muehlenbacher and Detective Jones then left the room. Officer Anderson talked to appellant for a few minutes and appellant agreed the other officers should return. Officer Jones then suggested to appellant that he be given six questions in writing and that he should write the answers. Appellant agreed and all of the officers left the room. Appellant wrote out the answers and in about ten minutes knocked on the door, and when the officers entered he gave them the answers he had written out. The substance of the answers made by appellant in his handwriting was that the boy died because of an "accident; " appellant did not remember at "just what time the boy died; " appellant met the boy at the mall and they walked to the area

where the body was found; and that appellant did sexually molest the boy. Officer Anderson then wrote out a statement, and after making several corrections and initialling them appellant signed that statement. Officer Anderson then asked appellant if he would write in his own handwriting what had occurred on May 26, and appellant did so, and he then dated and signed it.

The officers then took another break while appellant walked around inside the building. The prosecuting attorney was called, and after a conference, the officers took a statement from appellant on cassette tape in which he related in detail what occurred on May 26, 1978, and which constituted a confession. There is no indication in the record, and certainly not in the tapes, that appellant did not make the statements with a complete understanding and with complete cooperation on his part. In fact, on one tape appellant can be heard laughing with the officers during the interrogation.

After appellant made the recorded confession the police officers did not place him under any restraint. Instead they took appellant to his home because, as they said, they knew "he wasn't going to run away." Appellant agreed that on the following morning he would take the officers to the site of the crime, and the next morning when the officers arrived at his house he was waiting for them on the front porch. He then took the officers to the exact place where the body of the boy had been found about nine months earlier.

Although in his point appellant asserts, in the form of a conclusion, that his confession was "involuntary," it appears from the point and particularly from the argument that the contention of involuntariness is based on an alleged illegal arrest and not on the basis that he was not properly and fully informed of his Fifth Amendment rights by use of the "*Miranda*" warnings. However, it is clear from the record that prior to every interview of appellant by the police pertaining to this case, except possibly the first two, he was fully informed of those

rights, and there is nothing to indicate that he did not understand his rights, or that he did not, with full understanding, waive those rights. Appellant does not contend otherwise.

In support of his contention that his confession was not admissible in evidence because he was illegally arrested, appellant relies primarily on *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In both of these cases the police did not have enough information to obtain a warrant for the arrest of the defendant, but in each case the defendant was apprehended, placed under arrest and involuntarily taken to the police station and subjected to questioning at which he gave incriminating statements. In the *Dunaway* case it was stated that "[d]etention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." The court then held that the police "violated the Fourth and Fourteenth Amendments when, without probable cause to arrest, they took petitioner into custody, transported him to the police station, and detained him there for interrogation."

The United States Supreme Court in the *Dunaway* case then determined whether, under the facts of that case, "the connection between [the] unconstitutional police conduct and the incriminating statements * * * obtained during petitioner's illegal detention was nevertheless sufficiently attenuated to permit the use at trial of the statements * * *."

██ In this case as in the *Dunaway* case the necessary "*Miranda*" warnings were given, and as in the *Dunaway* case, the statements in this case were voluntary for the purposes of the Fifth Amendment. But, as pointed out in *Brown v. Illinois*, supra, "[t]he exclusionary rule * * * when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth," and it was there held that "*Miranda*

warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation." It was further held in *Dunaway v. New York*, supra, that "although a confession after proper *Miranda* warnings may be found 'voluntary' for purposes of the Fifth Amendment, this type of 'voluntariness' is merely a 'threshold requirement' for Fourth Amendment analysis." The court then stated that in *Brown v. Illinois*, supra, it had "eschewed any per se or 'but for' rule, and identified the relevant inquiry as 'whether [the defendant's] statements were obtained by exploitation of the illegality of his arrest.' "

We are of the opinion that in this case the police had probable cause to arrest appellant on February 14, 1979, but in fact did not formally do so. In the *Dunaway* case, there was no formal arrest, but the police "seized" the defendant and took him "involuntarily" to the police station and placed him in an interrogation room. He would have been physically restrained if he had attempted to leave. In this case, however, the police had talked to appellant previously on several occasions. He had previously agreed to take the polygraph examination and had agreed to the use of sodium amytal. There is no indication that he was ever restrained in any way, or that he could not have terminated at anytime any interview. In fact, when Officer Anderson was asked what would have been done during the August interview if appellant said he wanted to go home, he replied that appellant would immediately have been taken home. The interrogation held on February 14 occurred after Officer Muehlenbacher telephoned appellant and asked him if he would again be willing to talk to the police about the murder of Eric Christgen, and appellant agreed. The officers then drove to his house to get him, and appellant voluntarily accompanied them to the headquarters of the Highway Patrol. There is no indication that appellant was ever restrained. In fact, after he had confessed he was not even then restrained. Instead, he was taken back to his home. This is not the type of "seizure"

referred to in *Dunaway v. New York*, supra, which was stated to be significant "to trigger the traditional safeguards against illegal arrest."

■ Next, assuming it is arguable that appellant was sufficiently restrained to constitute an "involuntary investigatory detention," the police unquestionably had probable cause to arrest appellant for investigatory purposes.

Missouri, and the courts generally, have adopted the definition of probable cause for a warrantless arrest which was set forth in *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). It was there stated that probable cause to arrest exists when the facts and circumstances within the knowledge of the arresting officers, and of which they have reasonably trustworthy information, are sufficient to warrant a belief by a person of reasonable caution that the person to be arrested has committed the crime for which he was being arrested. See *State v. Wiley*, 522 S.W.2d 281 (Mo. banc 1975); *State v. Howell*, 543 S.W.2d 836 (Mo.App.1976).

At the time the two officers asked appellant to accompany them to the Highway Patrol headquarters, they knew that Eric Christgen's death had resulted from a sexual attack and that appellant had previously been involved in sexually molesting a minor. They also knew that appellant had first lied to the police about his presence on the shopping mall on May 26, 1978 from which the boy was abducted, but that he had later admitted he had lied and that he was there. Also, police investigation of appellant's previous statements concerning his other activities on the day of the murder clearly established that appellant had lied concerning those activities on the day of the homicide. Finally, in the previous December when under the influence of sodium amytal and while relating his activities on the day of the homicide he had stated: "Before I killed—Before I went to the unemployment office." In view of the history of appellant being previously involved in a sexual offense, his obvious attempt by lying to the police to conceal his whereabouts and

activities on the day of the homicide, and then when under the influence of sodium amytal making the admission that on May 26, he had "killed" somebody, the police had probable cause to continue the investigation of appellant's involvement in the death of Eric Christgen, and to arrest him if it was necessary to complete the investigation. It turned out that a formal arrest was not necessary, but there is no question that if it had been necessary to make a formal arrest in order to complete the investigation and they had not done so, the police officers would have been derelict in their duty.

■ In the determination of whether there was probable cause to make an arrest, the courts must exercise a subjective judgment, and such determination depends upon the particular facts and circumstances of the case under consideration. *State v. Wiley*, supra. There clearly and unquestionably existed the necessary probable cause in this case.

■ Assuming, however, that the February 14 interrogation constituted an arrest, and also assuming that under the circumstances there was not probable cause for the arrest, appellant's confession was properly admitted into evidence because the confession did not result from exploiting the assumed illegal arrest.

In *Brown v. Illinois*, supra, the Supreme Court identified several factors to be considered in determining whether a confession was obtained by exploitation of an illegal arrest. It was stated that "In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun [Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)] required not merely that the statement meet the Fifth Amendment standard of voluntariness [and we previously have stated that the confession in this case clearly meets that standard] but that it be 'sufficiently an act of free will to purge the primary taint.'" Continuing the court stated that "It is entirely possible, of course, * * * that person arrested illegally frequently may decide to confess, as an act of

free will unaffected by the initial illegality," but it added that the *Miranda* warnings, alone and per se, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. The court refused to adopt a per se or "but for" rule, but stated that the question of whether the confession is the product of a free will must be answered on the facts of each case, and that no single fact is dispositive. The court then stated: "The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, * * * and, particularly, the purpose and flagrancy of the official misconduct are all relevant."

In this case several hours elapsed between the time appellant accompanied the officers to the Patrol Headquarters and the time when he made the confession. In addition an extremely important intervening circumstance occurred. The officers pointed out to appellant the results of their investigation which established that most of what appellant had previously told them concerning his activities on May 26, 1978 was not true. It was not until after this circumstance became known to appellant, and after there was a break in the questioning at which appellant used the restroom and was furnished coffee, and after a conversation dealing in generalities in which appellant told the officers about his girlfriend, that appellant related the details of the events on May 26, 1978 that resulted in the death of Eric Christgen.

In *Brown v. Illinois*, supra, it is stated that the "purpose and flagrancy of the official misconduct" is "particularly * * * relevant" in the determination of whether a confession was obtained by exploitation of an illegal arrest. As previously noted, we are of the opinion that there was no misconduct on the part of the police officers, but in any event there certainly was no flagrant misconduct. When we take into consideration that appellant was not "seized" and taken involuntarily to the police station, but on the other hand unquestionably voluntarily accompanied the police officers, and further consider the intervening circumstances of appellant learning that the police knew that his previous statements as to his activities on May 26, 1978 were not true, and take into consideration the total lack of any flagrant misconduct of the officers, and finally give due regard to the fact that appellant was fully and adequately advised of his *"Miranda"* rights, of which there can be no question that he fully understood, it would be most unrealistic and lacking in logic to conclude that any causal connection between the assumed illegality and the confession was not completely attenuated resulting in the confession being an act of free will that completely purged any primary taint.

The trial court did not err in refusing to suppress the confession of appellant, and in permitting it to be admitted into evidence.

◼ Appellant's remaining point is that the trial court erred in failing to sustain appellant's challenges for cause to two persons on the venire panel because they "were not qualified to serve due to their equivocal answers concerning their ability to give appellant a fair trial."

In support of this contention appellant relies on the answers given to the following questions asked of Mrs. Echterling and Mrs. Landfather during the voir dire examination:

"MR. NATION: ... Could it [knowing Michael Insco] affect you?

"MRS. ECHTERLING: Not because of Michael. I have grandchildren who were the same age as Eric (the victim) at the time, whatever—I mean, I think I would be fair enough to the two of you (the attorneys). I am wondering about my feelings, about how I might feel about it being a child in the case.

"MR. NATION: All right. I'll get into that later.

* * * * * *

"MR. NATION: Now, I'll get to the question that Mrs. Echterling raised. Do any of you have small children, or small grandchildren that would be, say, under ten years old? Let's see a show of hands. (Several responses).

"Now, realizing at the outset that this case involves the abduction of a child that age, and realizing that you people are parents, or grandparents, of children in that age group, could that give you any difficulty in this case? Mrs. Echterling, I think you mentioned earlier that it might tend to affect you. Would you explain that?

"MRS. ECHTERLING: Well, especially since they said that some of the circumstances would be rather gory, and some of the things that had happened, I'm wondering in all fairness how I would feel hearing this and how I would judge once I heard it. Because, you know, I do have little ones that are the same age. I'm a rather tender-hearted person, or compassionate person, especially towards children.

"MR. NATION: I think that is a very common feeling towards one's children and grandchildren.

"MRS. ECHTERLING: I would try to be fair; I really would.

    \*    \*    \*    \*    \*    \*

"THE COURT: Wait; let me get something straight. Mrs. Echterling, are you saying you think you might be inclined to find the defendant guilty because he is accused of this terrible crime?

"MRS. ECHTERLING: No. I don't think I would be as much—

"THE COURT: That's the only issue, whether or not the defendant is the one that did the crime. It's a terrible crime, but at the same time just because it's terrible doesn't make any one person any more likely to be guilty than not.

"MRS. ECHTERLING: No; I agree with that.

"THE COURT: That's what we want. We are trying to find out whether or not anybody feels because of the accusation of this crime, and it's such a terrible crime, they might find him guilty simply because he is accused of it.

"MRS. ECHTERLING: Well, I hate to say that I—I really don't know how I would react to it. That's the thing. I've never sat in court and—

"THE COURT: Neither has most of the other people. You are right in the same boat.

"MRS. ECHTERLING: Like I said, I would do my best. I think I would be fair enough; I really do. I think I would be fair.

    \*    \*    \*    \*    \*    \*

"MR. CROSSETT: All right. You indicated this morning that you had heard something about this case; everyone had heard something about the case. You may have heard this by way of newspaper, radio or television, possibly even a friend may have told you something about the case. My question to you right now is, can you put aside everything that you previously heard and base your decision in this case solely upon the evidence presented in this courtroom from here on out?

"MRS. LANDFATHER: I think it might be a little difficult.

"MR. CROSSETT: What would make it difficult for you, ma'am?

"MRS. LANDFATHER: Probably because a child was involved.

"MR. CROSSETT: Are you saying that it's an unpleasant or gruesome type of case.

"MRS. LANDFATHER: Yes.

"MR. CROSSETT: Well, I understand that, and I understand that it's unpleasant for everyone, but would it make it more likely for you to acquit or convict the defendant based upon your prior feeling?

"MRS. LANDFATHER: Well, it shouldn't, really.

"MR. CROSSETT: I understand that it's unpleasant. It's unpleasant for everyone.

"MRS. LANDFATHER: That's right.

"MR. CROSSETT: What we are interested in is insuring that we have a fair trial

and that the defendant receive a fair trial. Do you believe that you can put aside everything that you have previously heard, even though the facts in this case will be unpleasant? Do you believe you could afford the defendant a fair trial in this case and listen to the evidence fairly and impartially and deliberate on that evidence in returning your verdict?

"MRS. LANDFATHER: Yes, I would."

██ It is well-settled that a defendant in a criminal trial is entitled to a full panel of qualified jurors before he is required to make peremptory challenges, *State v. Dodson*, 551 S.W.2d 932 (Mo.App.1977), and the failure of the court to excuse for cause a legitimately challenged venireman is reversible error. *State v. Lovell*, 506 S.W.2d 441 (Mo. banc 1974); *State v. Morrison*, 557 S.W.2d 445 (Mo. banc 1977). Appellant's challenge to two members of the panel was the same as to each and was not based on statutory grounds. As for nonstatutory challenges, the rule is that the trial judge is vested with broad discretion, that his decision should not be overturned unless there is a clear abuse of discretion, and that any doubts are to be resolved in favor of the trial judge's decision. *State v. Dodson*, supra; *State v. McGrew*, 534 S.W.2d 549 (Mo. App.1976); *State v. Thompson*, 541 S.W.2d 16 (Mo.1976). In the review of the issue of an abuse of discretion, the appellate court must judge each case on its own particular facts. *State v. Land*, 478 S.W.2d 290 (Mo. 1972).

Mrs. Echterling indicated that she had grandchildren who were the same age as the victim in this case, and was "wondering * * * how [she] would feel hearing this [apparently the details of the crime], and how [she] would judge once [she] heard it," because she had not sat in court before. But she added that she would "do my best," and she believed that she "would be fair enough" and she thought she "would be fair."

Mrs. Landfather first indicated that it "might" be difficult to put aside everything she had previously heard about the case and decide the case solely on the evidence presented because a child was involved and the facts were gruesome and unpleasant. But, she added this should not cause her to be more likely to acquit or convict appellant. Then when the assistant prosecutor explained her duty as a juror, she unequivocally stated that she could give appellant a fair trial, and would listen to the evidence, and would deliberate on that evidence in returning her verdict.

██ The facts of this case are sordid and most unpleasant; the death of a four year old child resulting from sexual molestation. No member of the panel could honestly state that the facts would have no effect whatever. But both of the challenged members of the panel made it clear that each would try to, and felt that she could give appellant a fair trial. One cannot properly ask more of a juror. They did not equivocate on their intent and ability to do that. Their equivocation, if any, pertained to the possible reaction to the sordid and gruesome details of the crime, but this was a problem facing every member of the jury. It is for the trial court, and not the venireman, to determine whether a challenged member of the panel could be an impartial juror, but the testimony of the member concerning his ability to do so is evidence to be considered by the trial court. *State v. McGrew*, supra; *State v. Dodson*, supra. Based solely on the record before us we consider this to be a case in which in the sound exercise of his discretion the trial judge could properly have excused the two members here challenged. We also are of the opinion that after the trial court observed the challenged members, and after listening to the testimony, in the exercise of its broad discretion in matters of this nature it was not an abuse of discretion which would require reversal of the judgment to overrule the challenge as to each.

The judgment is affirmed.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the court.

MORGAN, P. J., DONNELLY, C. J., and RENDLEN, J., concur.

BARDGETT, J., not participating.