**STATE of Missouri, Respondent,**

v.

**Stephen A. MARTIN, Appellant.**

**No. 57154.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Aug. 28, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 3, 1990.

Application to Transfer Denied
Nov. 20, 1990.

Rosalynn Koch, Columbia, for appellant.

William L. Webster, Atty. Gen., Robert V. Franson, Asst. Atty. Gen., Jefferson City, for respondent.

GARY M. GAERTNER, Presiding Judge.

Appellant, Stephen A. Martin, was charged by indictment with two counts of armed criminal action and one count of assault in the second degree. In a separate indictment, appellant was charged with first degree murder. The State of Missouri waived the death penalty and the charges in both indictments were consolidated upon the State's motion. After a jury trial, which began June 12, 1989, and lasted until June 16, 1989, appellant was found guilty of murder in the second degree, second degree assault and two counts

of armed criminal action. The jury assessed punishment to be life imprisonment for murder, a concurrent fifteen year term for assault, one consecutive term of fifteen years for the armed criminal action charge which related to the murder, and a concurrent three year term for the armed criminal action charge which arose out of appellant's assault conviction. We will first briefly summarize the facts of this case.

Appellant and Barbara Henderson, the victim, had been living together along with the victim's thirteen year old daughter and five year old daughter. Appellant suffered from a drinking problem which caused him to lose his employment as a research engineer with Emerson Electric, a job which he had held for 10 years. His drinking and his trips to an alcohol treatment center strained his relationship with the victim and the two of them parted company sometime around April of 1988. Appellant took up residence in the basement of the victim's apartment building, when he wasn't in a treatment facility.

Around the middle of May, 1988, appellant left a care unit treatment center, against doctor's orders, and claims to have intended to embark on a new life. To this end, he attempted to withdraw what little money, $100.00, he claimed he left deposited in the victim's checking account. However, the money had been withdrawn by the victim, who refused to give it back.

On May 24, 1988, appellant went to a local sporting goods store and purchased a used .22 caliber rifle and a box of 50 bullets. Appellant testified that he bought the rifle and bullets because he thought it would be necessary to use force to get his money back from the victim and because he was afraid of being assaulted by certain members of the victim's family who lived in the same apartment building.

Later that day, when he heard the victim's eldest daughter, Sabrina, leave the house, appellant proceeded upstairs, loaded gun in hand, to confront the victim about the missing money. While appellant and victim were talking, Sabrina came back in and became frightened. Sabrina called her Aunt Rose Beck Slater (victim's sister) and

told her that appellant was inside the apartment with a gun. Ms. Slater phoned the police.

Four police officers arrived and ascended the stairs to the victim's apartment. After twice announcing their presence, the officers heard screaming from inside and attempted to kick in the front door, without success. They then heard three gunshots and one of the officers reported that he had been shot. Appellant had fired thrice at victim, striking her once in the head and once in the chest. The third shot travelled through the wall of the apartment and struck the officer, who was perched on the hallway steps.

The officers, not precisely sure from whence the shot which hit their comrade had originated, ran down the steps and out to the front lawn where they attended to the wounded officer. Shortly thereafter, appellant emerged from the building and was apprehended.

At trial, appellant admitted to the shooting but claimed that the stress of his alcohol problem and dismal living quarters caused him to panic when he heard the police; he did not deliberate on victim's death nor intend to cause her harm. The jury partially agreed, finding him guilty of second degree murder, rather than first degree murder. We will address each of appellant's three claims on appeal in the order he has presented them to this court.

Appellant's first point is that the court erred in not striking venireperson Lisa Coholan for cause after she expressed reservations about how her emotions might affect her ability to be a juror. During appellant's voir dire, the following exchange took place:

Mr. McGRAUGH: I know this is a difficult question to answer, but what you are called to do is only listen to the evidence from the witness stand and as jurors you are fact finders and I guess that alone is kind of cold and I am not asking you to be computers but at the same time you have to rely on both sides of your brain.

VENIREMAN COHOLAN: I just don't think I can.

MR. McGRAUGH: You think your emotional side would—

VENIREMAN COHOLAN: I cry just like that or I'm angry just like that (snapping fingers).

MR. McGRAUGH: And if the Judge instructed you—

VENIREMAN COHOLAN: Well, he can say what he wants (laughter).

MR. McGRAUGH: That's true.

VENIREMAN COHOLAN: I agree.

MR. McGRAUGH: So even if the Judge instructed you, you don't think that you could?

VENIREMAN COHOLAN: I will do the best I could, but I can't promise you. You can't change what goes on inside of me.

The prosecution, during its voir dire, also questioned venireperson Coholan about her emotions. The relevant portion of this conversation is as follows:

MR. BAKER: Coholan. Sorry. I know I'm putting you on the spot too, but let me ask you the same question: Regardless of how you respond to that person, because that's part and parcel of how we evaluate every day, would you still be able to apply the same types of standards, and evaluating an emotional witness is truthful as you would a nonemotional person?

VENIREMAN COHOLAN: I guess so.

MR. BAKER: I mean you have to tell me. I don't want to put any words in your mouth. In that sense, when somebody stated/In everyday life do you have occasion to encounter people that are emotional and also people that are unemotional?

VENIREMAN COHOLAN: I raised two kids. I really don't get a chance to talk to anybody.

(Laughter).

MR. BAKER: ... But even in dealing with them, sometimes they are emotional, sometimes they are unemotional. Is that a fair statement?

VENIREMAN COHOLAN: Uh-huh (yes).

MR. BAKER: Just because they are emotional doesn't always mean they are telling the truth, does it?

VENIREMAN COHOLAN: Right.

MR. BAKER: So you are able to evaluate their truthfulness and how they are talking to you independently of whether they are emotional or not even though it may really tug at your heart strings to do it, right?

VENIREMAN COHOLAN: Yes.

MR. BAKER: Do you feel you would be able to use those same standards in this case to evaluate the truthfulness of witnesses here?

VENIREMAN COHOLAN: Yeah.

MR. BAKER: Again, if you don't agree with me, don't tell me you do because I'm not trying to get you to agree with everything I'm saying.

VENIREMAN COHOLAN: I want to honestly know.

MR. BAKER: Okay. You think you would be able to do that.

VENIREMAN COHOLAN: Yeah.

■ The appellant was entitled to a full panel of qualified jurors before using his peremptory challenges. *State v. Hopkins*, 687 S.W.2d 188, 190 (Mo. banc 1985). The denial by the trial court of a legitimate request to excuse a member of the venire for cause constitutes reversible error. *Id.* However, the trial court possesses broad discretion in determining the qualifications of prospective jurors and we will not disturb the court's rulings on appeal unless they are against the weight of the evidence and constitute a clear abuse of discretion. *State v. Lingar*, 726 S.W.2d 728, 733 (Mo. banc 1987). In the case at bar, we do not find the trial court's refusal to strike venireperson Coholan was error.

■ Appellant's attorney prefaced his questions to Ms. Coholan by commenting that the trial would likely be a very emotional one and would involve testimony from a number of witnesses. It was apparent that defense counsel was attempting to determine whether the jurors would be able to separate their emotions from the testimony and fairly view the facts.

Ms. Coholan indicated that she was, indeed, an emotional person. She also stated, in response to the prosecutor's questions, that she could evaluate the witnesses' truthfulness independent of whether the witnesses were emotional. The mere

fact that a potential juror is emotional should not be the basis for a challenge for cause.

A similar case to this one is *State v. Reynolds*, 619 S.W.2d 741 (Mo.1981). In *Reynolds*, the defendant was charged with the murder of a five year old boy. The defendant sought to remove two jurors who had indicated that the details of the gory death of a young child might taint their impartiality because, as one juror put it, "[she was] a rather tender-hearted person, or compassionate person, especially towards children." *Id.* at 748. The gist of defendant's argument in favor of striking these jurors seemed to be that these jurors' emotional responses would adversely affect their ability to accurately judge the evidence.

The Missouri Supreme Court, in affirming the trial court's refusal to strike these venirepersons, pointed out that none of the panel members could honestly state that the facts would not have an affect on them. *Id.* at 749. Moreover, the court noted that both members indicated that they would try to give defendant a fair trial and believed that they could do so. *Id.*

Likewise, Ms. Coholan indicated that she would be able to evaluate the truthfulness of the witnesses, despite her emotions. The real issue in determining Ms. Coholan's qualifications as a juror is whether, on the whole, her responses indicated her ability to evaluate the evidence fairly and impartially. See *Lingar*, 726 S.W.2d at 734. We believe that the trial court did not clearly abuse its discretion in finding that Ms. Coholan possessed this ability.

■ Appellant's second point on appeal concerns the testimony of one of the policemen. Officer Robert Muller, one of the responding officers, described the screaming that he heard coming from inside the apartment as he reached the victim's door. The relevant portion of his testimony is as follows:

> Q Let me back up a little bit. You said you heard, you talked about hearing screaming. Okay. Could you describe for the jurors?

MR. McGRAUGH: I will object, your Honor. That's inflammatory.

THE COURT: Well,—

MR. McGRAUGH: And testimony is clear from his earlier statements he heard screaming and pleading.

THE COURT: Could I hear the whole question.

Q (By Mr. Baker) The question: Could you describe for the jurors what that screaming sounded like, the intensity of that screaming?

MR. McGRAUGH: Objection, your Honor. That's irrelevant and it is inflammatory and meant to inflame the jury and has no probative value.

MR. BAKER: Your Honor, I think it has a great deal of probative value to explain the conduct of the police as to how they perceived the situation.

THE COURT: I will overrule the objection.

Q (By Mr. Baker) Could you describe for the jurors.

A Like I say, I have been a police officer 32 years and I have handled just about every type of situation that I think there can be and I don't think I have ever heard anyone who sounded as desperate in that lady in her pleading for help.

MR. McGRAUGH: I object to this, ...

Appellant claims this testimony was irrelevant and inflammatory, its sole purpose being to arouse the jury's passions against him. We do not agree. A trial judge is afforded wide latitude in determining whether to exclude or admit evidence. *State v. Clark*, 711 S.W.2d 928, 932 (Mo. App., E.D.1986). The admission of evidence which is attacked as prejudicial or inflammatory is within the sound discretion of the trial judge. *State v. Berry*, 609 S.W.2d 948, 954 (Mo. banc 1980). Relevancy is found if the evidence logically tends to support or establish a fact in issue. *Id.* Without a clear abuse of discretion, we will not interfere with the trial court's ruling. *Clark*, 711 S.W.2d at 932.

In *Berry*, the defendant was charged with forcible rape. *Berry*, 609 S.W.2d at 950. A witness testified that the victim "looked like she had been dead" (victim did not die from the attack) when the witness

saw her right after the incident had occurred. *Id.* at 954. The Supreme Court of Missouri, in affirming the admission of the statement, stated that since the defendant pled not guilty, he put in issue all facts constituting the corpus delecti. *Id.* Additionally, victim's condition immediately after the rape was pertinent to the issue of force. *Id.*

In the case at bar, the victim's screams and their intensity were part of the corpus delecti of appellant's crime. We also note that the respondent was attempting to prove that appellant premeditated upon his shooting the victim. The victim's screams and conduct just prior to being shot would indicate that appellant had time to deliberate and was in the process of contemplating his next move; a gunshot. Point denied.

■ Appellant's third claim of error involves an emotional incident which took place right after the court had declared a recess. Rose Beck Slater, victim's sister, had finished her testimony and the trial judge excused the jury for a brief recess. As Ms. Slater was departing from the witness stand, her emotions got the better of her and she rushed toward the appellant presumably with the intention of inflicting some sort of violence upon him. Before she reached the appellant, she was restrained by court security and the prosecutor. Eight of the fourteen jurors (including alternates) saw or caught a glimpse of the incident while two of them stated that they heard about it but did not see it. The court conducted a hearing in which each of the jurors was questioned individually regarding their knowledge of the incident and whether it would affect their ability to give appellant a fair trial.

Appellant requested a mistrial because of the inflammatory, emotional effect the incident may have had on the jury and because two jurors committed misconduct by talking about the incident during a recess. On appeal, appellant's only claim is that the two jurors who "allowed" the case to be discussed in their presence were guilty of violating MAI–CR3d 300.04. Appellant asserts that the court should have granted his request for a mistrial. We disagree.

Appellant claims that the two jurors failed to follow the judge's instruction to not discuss the case among themselves or with others or to allow anyone to discuss it in their presence. See MAI–CR3d 300.04. However, when questioned by both sides, the most that can be said is that the jurors heard about the incident. None of the jurors stated whether they heard it from another juror, a third party or just picked it up from nearby conversation which did not involve them. We would be stretching the court's instruction well beyond reasonableness were we to hold that the latter means of communication constituted misconduct. Without a clearer record, we hesitate to call the instant revelations misconduct.

Moreover, the event in question should not have come as a complete surprise. Ms. Slater was the victim's sister, understandably upset over the tragic loss of her sister. Such an outburst, while under the best of the circumstances should be avoided, cannot be said to warrant a mistrial.

In *State v. Hathaway*, 269 S.W.2d 57 (Mo.1954), a prosecution witness left the stand in tears, emotional after having testified regarding defendant's assault upon her. *Id.* at 60–61. The defendant on appeal argued that the emotional outburst prejudiced the jury. *Id.* at 60. The Supreme Court of Missouri disagreed, concurring with the trial court's determination that her emotional response was to be expected and that the same response would be expected at another trial. *Id.* at 61.

Likewise, we believe that Ms. Slater's reaction was, as juror Cody stated in response to defense counsel's queries, "just a normal reaction at the time." Ms. Slater's attempt to get at the appellant may, unintentionally, have damaged her own credibility by vividly revealing her hatred for appellant; providing a motive for her to testify against him. Point denied.

Appellant's final claim of error relates to the prosecution's questioning of an officer about appellant's refusal to put his confession on video tape. This issue is the most difficult of the four.

■ After the prosecution had elicited a detailed account of appellant's confession

and interrogation from Officer Wilcox, he continued to question the officer regarding the appellant's subsequent request to speak to an attorney and his refusal to continue answering questions. The officer's testimony transpired as follows:

Q Okay. After this statement had been made to you, did you take any further steps to try to make a report of it in any way?

A Yes, sir, I did.

MR. McGRAUGH: Object, your Honor....

THE COURT: ... I will overrule the objection.

\*   \*   \*   \*   \*   \*

Q Did you make any other request to try to make a visual record of what happened?

A Yes, sir, I did.

Q And what was that?

A I asked him if he would be willing to give us a statement on videotape.

Q When you asked him that, what happened?

A He said that he thought he should talk to an attorney first.

Q Is that the first mention that he had made of wanting to talk to an attorney?

A Yes, sir, it is.

Q And when he asked to talk to an attorney, did you in fact make arrangements for him to do so?

A I did.

Q After that was completed, did you renew your request?

A No, sir. After he had talked to an attorney, he indicated he did not wish to make any further statement.

Respondent, in support of the trial court's actions, places great weight on the fact that appellant had originally waived his Fifth Amendment right against incrimination and provided Officer Wilcox with a detailed account of the events of May 24, 1988. There is no disputing that appellant was properly given his *Miranda* warnings and waived his right to remain silent. However, once waived, appellant had the right to cease the interrogation.

The landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), required that those taken into police custody be informed that they have the right to remain silent, that anything they say can be used against them and that they have the right to counsel before submitting to interrogation. *Id.* at 467–73, 86 S.Ct. at 1624–27; *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91 (1976). Further, if the person being questioned "indicates, in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege." *Miranda*, 384 U.S. at 473–74, 86 S.Ct. at 1627–28. The Western District in *State v. Smart*, 756 S.W.2d 578 (Mo.App., W.D. 1988), put it most succinctly: "The state is entitled to rely on a waiver of the privilege against self-incrimination given after full disclosure to a suspect of his rights. Although the waiver is not irrevocable, it is certainly effective until withdrawn. If the privilege is reasserted, it is not available to avoid a single offensive question, but to cease all questioning, and the suspect is under an obligation to communicate his decision in an intelligible fashion." *Id.* at 581.

In the present case, appellant clearly indicated that he wished to speak to an attorney and that he wanted all questioning to cease. While neither the *Miranda* warnings themselves nor the Fifth Amendment expressly provide that silence will carry no penalty, it is implicit that an accused's acceptance of the Fifth Amendment's protections will not be used against him at trial. *Doyle*, 426 U.S. at 619, 96 S.Ct. at 2245; *Smart*, 756 S.W.2d at 580. Thus, as soon as appellant asserted his privilege, as he had the right to do, all questioning was required to cease and the prosecution was not allowed to comment on appellant's request for an attorney and refusal to submit to a video taping.

Respondent asserts that the questions were designed, not to draw an adverse inference from appellant's refusal to testify, but to support respondent's contention

that the interrogation was not coercive and that the officer's involved allowed appellant to stop answering questions when he so chose. We are quite aware of the cases which hold a prosecutor's comments regarding an accused's silence can be admissible as a prior inconsistent statement, *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) and those which permit further questioning where the accused is silent as to one question but does not indicate an intention to assert his/her rights and cease the interrogation. *State v. Smart*, 756 S.W.2d 578 (Mo.App., W.D.1988). In these situations, however, the prosecution was questioning the defendant on cross-examination. In the present case, the questions at trial arose during the State's case-in-chief, not upon cross-examination of the appellant and there was no evidence indicating that the interrogation was coerced. A holding which would permit the State to bring in evidence of an accused's assertion of his privilege premised on the State's fear that the defendant would later question the propriety of the interrogation, not as rebuttal to defendant's evidence, would create a gaping hole in the accused's privilege. We will not so hold.

■ Having determined that the reference to appellant's failure to submit to a video taping was erroneously admitted, we must determine whether such error warrants a reversal of appellant's conviction. We will sustain the conviction if we find that the error is harmless beyond a reasonable doubt. *State v. Grubb*, 705 S.W.2d 83, 84 (Mo.App., E.D.1985).

In the case at bar, evidence of appellant's guilt is overwhelming. Four police officers were present at the time of the incident and apprehended appellant immediately after he exited the building. Appellant himself testified that he went and bought a rifle and a box of bullets for use in his attempt to get his money back from the victim, took the loaded gun to her apartment and fatally shot her. Indeed, appellant's defense was not that he did not kill his ex-girlfriend, but that he did not premeditate before doing so.

The video tape that the police sought to produce was not related at all to appellant's mental state at the time of the shooting. Moreover, appellant had spoken in great detail to the interrogators, admitting his involvement in the crime before being asked to put his story on tape. Presumably, the taped version would have contained the same version of events appellant had already orally given to his interrogators and which Officer Wilcox recounted at trial. While appellant had every right to demand to speak with an attorney, to refuse to be placed on video tape and to not have these requests brought up at trial, we cannot conclude that the erroneous admission of the testimony could have had any effect upon the outcome of this action. As Presiding Judge Nugent of the Western District stated in his concurring opinion in *Smart*, "if [defendant] were tried one hundred times on this evidence, with or without [the detective's] testimony, she would in my opinion be convicted one hundred times." *Smart*, 756 S.W.2d at 582. So it is, also, with the appellant in our case.

Appellant's conviction and sentence are affirmed.

CRIST and HAMILTON, JJ., concur.