**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Donald YOUNGBLOOD,
Defendant-Appellant.**

**No. 12539.**

Missouri Court of Appeals,
Southern District, Division One.

Feb. 2, 1983.

Motion for Rehearing or to Transfer to
Supreme Court Denied Feb. 24, 1983.

Application to Transfer Denied
April 26, 1983.

John D. Ashcroft, Atty. Gen., Theodore A. Bruce, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Richard Anderson, Kimberling City, for defendant-appellant.

GREENE, Chief Judge.

Defendant, Donald Youngblood, was jury-tried and convicted of the crime of first degree robbery and sentenced to 25 years' imprisonment by the trial court, in accordance with the jury verdict. This appeal followed.

Youngblood does not question the sufficiency of the evidence to sustain the conviction. It suffices to say that a review of the record conclusively shows that there was evidence submitted to the jury from which they could find, beyond a reasonable doubt, that, on October 27, 1980, Youngblood forcibly stole $12,676, the property of the Peoples Bank and Trust Company, by taking the money from the possession and custody of Clara F. Bailey, an employee of a branch of the bank at Hollister, Missouri, while Youngblood was displaying or threatening the immediate use of a dangerous instrument, which was a pistol, against Ms. Bailey if she did not comply with his demand that she give him the money. This evidence met all of the requirements for a conviction of the crime of robbery in the first degree. § 569.020.[1]

Youngblood's first point is that the trial court committed prejudicial error by overruling his challenge for cause of prospective juror Jerry Coday. Youngblood contends that Coday was clearly biased and prejudiced in favor of the state "as evidenced by his stated belief that the mere arrest of the defendant and his presence in court constituted evidence of his guilt of the offense charged." Coday did not serve on the jury, but Youngblood's attorney was forced to use one of his peremptory challenges to remove him from the jury panel after the trial court denied his challenge for cause.

The pertinent portion of the voir dire examination of Coday, a question directed to the entire panel including Coday, and the trial court's ruling on the issue are as follows:

"Mr. Anderson: Do you have any—I asked this generally of all the jurors, but do you have anything—any personal opinions or feeling that just because Don Youngblood is here today, he's been arrested and he's in Court, that that's evidence he is guilty of a crime of bank robbery?

Mr. Coday: I figure where there's smoke there's fire.

Mr. Anderson: Would you elaborate on that? I mean, are you saying that that would—just the fact he is here would constitute evidence in your mind that he would be—at least some evidence he would be guilty of the offense?

Mr. Coday: Some, yes.

Mr. Anderson: And, if the judge tells you that that's an improper assumption to make and that the fact that he is here and being tried and that's no evidence for you to consider in this case, could you put that feeling aside? How strong a feeling is it to you personally?

Mr. Coday: I could probably put it aside.

Mr. Anderson: Do you understand that the law does give Don a presumption this moment that he is innocent of the charge?

Mr. Coday: Yes.

Mr. Anderson: Do you understand that?

Mr. Coday: Yes.

Mr. Anderson: Do you fault that presumption in any way as being an improper presumption the law gives him?

Mr. Coday: No.

. . . .

Mr. Anderson: Now, just a summation and my last question: is there anyone here who feels that there's anything which would be proper to consider as evidence in this case other than what is heard from this witness stand right here? Are you all going to accept what is heard

---

1. All statutory references are to RSMo 1978 except where otherwise noted. All citations to rules are to Missouri Rules of Court, V.A.M.R.

here on the witness stand as evidence in this case, and that's going to be the basis of your verdict? Everyone willing to do that?

(No response.)

Mr. Anderson: That's all.

. . . .

The Court: Mr. Anderson, do you have any further requests for strikes for cause?

Mr. Anderson: We would additionally move to strike for cause juror number two, Jerry Coday. He stated the belief that where there's smoke, there's fire.

The Court: Number two?

Mr. Anderson: Yes, we move to strike him for cause.

The Court: Do you have any objections?

Mr. Justus: Your Honor, when he was asked about that, he said he could put that all aside and listen to the evidence today. I don't think he should be struck.

The Court: Request for strike for cause of Mr. Coday denied. He did say that he could—first of all, I believe, you asked him if he believed in the proposition of presumption of innocence, and he stated that he did and that he could go into it with an open, objective mind."

■ The constitutional right to trial by an impartial jury includes the right of the defendant to have a full panel of qualified jurors prior to his being required to make peremptory challenges. The failure of the trial court to grant a legitimate challenge for cause is reversible error. *State v. Reynolds,* 619 S.W.2d 741, 749 (Mo.1981). However, the trial court has great discretion in determining whether a challenge for cause should be sustained or denied, and that ruling will not be disturbed on appeal unless it is clearly contrary to the evidence and constitutes a clear abuse of discretion. *State v. Treadway,* 558 S.W.2d 646, 649 (Mo. banc 1977), cert. den., 439 U.S. 838, 99 S.Ct. 124, 58 L.Ed.2d 135 (1977); *State v. Reynolds,* supra.

■ On review of the cold record, any doubt in the matter should be resolved in favor of the finding of the trial judge for he was in a far better position than we, having had the opportunity to view the parties, to determine the validity of the challenge for cause. *State v. Pitchford,* 556 S.W.2d 57, 60–61 (Mo.App.1977). Viewed in this light, we cannot say that the trial court clearly abused its discretion by failure to sustain the challenge.

■ While Coday did initially express the opinion that a person having been charged with a crime was at least some evidence of guilt, he further responded, after the presumption of innocence was explained by Youngblood's attorney, that he did not find such presumption improper. When the panel was asked a general question by the defense counsel, Coday indicated, by not responding, that the only evidence to consider against Youngblood was what the jurors heard from the witness stand as evidence. Also, when the trial judge read an instruction containing the presumption of defendant's innocence, and asked if any juror could not follow that instruction, no member of the panel responded, including Coday.

■ While it is always better for a trial judge to remove a potential juror from a panel for cause, if there is the slightest hint of bias or prejudice on the part of a jury panelist, practicalities and common sense dictate that the trial judge weigh all factors, including the jurors' responses, demeanor, and attitude, before deciding. Based upon the facts here, the trial court did not commit a clear abuse of discretion in overruling the challenge for cause of juror Coday. The point is denied.

Youngblood's second and third points are also jury related. He alleges that the trial court committed prejudicial error in overruling his challenge for cause to venirewoman Ruby Lemmons. Youngblood argues that Mrs. Lemmons was an ineligible juror because she had not been selected and summoned in the manner required by statute, but was a volunteer juror. He contends that since he had to use his peremptory challenges to remove other potential jurors, Mrs. Lemmons became the alternate

juror. She sat with the regular jury and heard all of the evidence. Youngblood further argues that the trial court committed additional prejudicial error by discharging juror Dorothy Mitchell, over objection, from the panel at the close of all of the evidence. He alleges that no legal grounds for the discharge had been demonstrated, and that such discharge enabled Ruby Lemmons to become a regular member of the jury panel that was to debate his fate. Youngblood argues that because Mrs. Lemmons had a daughter employed by the Wright County Bank in Hartville, he was prejudiced by her serving, and that the trial court further erred in denying his challenge for cause of Mrs. Lemmons for that reason.

The facts relating to this unusual conglomeration of claims of error are that after the attorneys announced ready for trial, the clerk of the court called the roll of jury panel members present, which included the names of Dorothy Mitchell and Ruby Lemmons. It was discovered, either prior to or during voir dire, that Ruby's husband, Orin Lemmons, had been summoned to appear as a juror for the trial. Orin was a farmer and the hay gathering season was in progress. Orin was working in his hay fields, so Ruby reported as a juror in his stead.

This fact was known to defense counsel prior to his voir dire examination of the jury panel, and he raised no objection at that time, as evidenced by the following disclosure:

"The Court: Let the record show that we are still out of the presence of the jury in the courtroom, and the defendant now is present, and it has come to the attention of the Court by the circuit clerk that two of the panelists, panelist number 27, William R. Carty, and Ruby Lemmons, panelist number 28, were not the original members of the panel; that Mrs. Lemmons is the wife of Mr. Lemmons who was in the hay field and could not come. She volunteered to come in this morning to serve on the panel, and Mr. Carty was incorrectly called by the sheriff to serve on the jury, and I think the

regular panel selected by the jury commission had the same name, and he mistakenly called this Mr. Carty. Mr. Justus, do you have any objections—

Mr. Justus: —No, Your Honor.—

The Court: —for those two persons to serve on the—

Mr. Justus: —I have no objections. It appears that one was just a mistake and the person came in because he thought he was called, and it also appears to me that Ruby Lemmons, the only reason she's here was her husband was called, and she felt it was necessary that he stay in the field, and I feel that's a good enough reason for me.

The Court: Now, Mr. Anderson, do you have any objections to the extent of wanting to file a motion to quash the panel?

Mr. Anderson: No, Your Honor, not to that extent. If we have an objection, it will be limited to juror Ruby Lemmons, that is based on this particular area of concern, and that would be just to strike her for cause it appears that she's volunterring [sic] to be here for reasons that will be unacceptable to the defendant.

The Court: The Court will permit you to voir dire her as you so desire on that particular point, if you would like, and then will consider your request for strikes for cause, if you should so make it."

During voir dire of Mrs. Lemmons, defense counsel learned that she and Orin had a daughter who worked at the Wright County Bank in Hartville. When asked if the fact that her daughter worked in a bank would bias or prejudice her in any way, Mrs. Lemmons replied, "No." At the conclusion of voir dire, defense counsel challenged Ruby Lemmons for cause with the following statement:

"Mr. Anderson: The Court might also consider at the same time juror twenty-eight, who we'd also move to strike for cause by reason—that's Ruby Lemmons, by reason her daughter works for the Wright County Bank, and also now at this time I would, for the reason that she as I understand it, voluntarily came in. I

would not move to quash the panel because of any irregularity with respect to her coming in, but I think as a volunteer and a person who's a mother with a daughter working at the bank, I think that just creates too prejudicial a situation for the defendant, and I would move to strike her for cause."

The trial court responded:

"Also, your request for strike for cause of Mrs. Lemmons, panelist number twenty-eight, is also denied. In both instances, Mr. Pellham and Mrs. Lemmons stated that they could go into the trial with an open mind, and the fact that their daughters worked at the bank would make no difference to them."

After both attorneys made their strikes, Dorothy Mitchell was named as one of the regular jurors, and the 13th juror remaining on the list, Ruby Lemmons, was named as the alternate juror. The jury, including Mrs. Lemmons, was sworn, and heard all of the evidence.

At the conclusion of the evidence, and out of the hearing of the jury, the following colloquy occurred between defense counsel, the trial judge, and the prosecuting attorney:

"Mr. Anderson: Your Honor, the defendant at this time would like to make a motion for a judgment of acquittal.

The Court: At the close of all evidence?

Mr. Anderson: At the close of all evidence.

The Court: Using the same arguments that you used when you filed your motion for judgment of acquittal at the close of the state's evidence?

Mr. Anderson: Yes, sir.

The Court: The Court denies that motion. At the beginning of the trial, it was agreed by all parties that we would have an alternate. One was selected, and one has sat throughout the proceedings and listened to the testimony. The Court has noticed in the course of the trial this date, and particularly this afternoon, that juror Mrs. Dorothy Mitchell has napped, has fallen asleep, visibly, and I feel that she should be permitted to go home, and that the alternate sit and deliberate upon the evidence. Do you have any objections for the state, Mr. Justus, that the Court dismiss and permit Mrs. Mitchell to go home?

Mr. Justus: No, Your Honor.

The Court: Mr. Anderson, do you have any objection?

Mr. Anderson: Yes, Your Honor. We would object to the juror being excused, and I think in that respect there has—the Court observed. I did not observe her sleeping. The Court has observed her with her eyes closed and perhaps nodding, and I don't think that this necessarily shows an inattention that should be a cause for being excused. The next juror, alternate juror, who is going to be taking her place was challenged for cause by the defendant, which that challenge was denied, and we would object to her being excused on that basis.

The Court: Do you have any response to—

Mr. Justus: —Your Honor, except that I was sitting and during—and did observe what appeared on two different occasions to me for her to be asleep, what I saw, and it appeared from looking at her that I thought she was asleep, although it is evidence in Court today that there is a—asleep or not asleep, eyes closed or whatever, might be an issue someway or another.

The Court: The Court observed her a number of times when the Court had no doubt that she was napping, because she would jerk herself and awaken, and generally I'm—I feel that those who deliberate upon the evidence should have knowledge of all of the evidence that was presented.

Mr. Justus: Your Honor, one more thing I might say in response: we all agreed to have an alternate juror. I gave up a total of three strikes to have an alternate, and I feel at this time that if that is apparent, and she was—that—appears that much out of it, the purpose of an alternate is to—in case something is

wrong with the other one. I think sleeping might be a reason, but we wanted the alternate there, and I gave up strikes to get her there, and I think if it seems in the best interests of all concerned to have a fair and impartial jury, that we ought to have twelve attentive, and based upon what I feel that's one reason you should use an alternate.

Mr. Anderson: When we start talking about what we gave up, the defendant did not want Ruby Lemmons on, and we challenged her for cause. She being one of the last jurors on the list, when Mr. Justus says he gave us two challenges, he also required that we allow him to make his four anywhere he wished to. So, thereby Ruby Lemmons was—remained on the jury by our being in a position where we felt we had to agree with Mr. Justus on that condition, and she remained on the jury over our challenge for cause, and by reason of the requirement of the state, she was not struck as one of the last three jurors on the list.

The Court: Off the record.

(There was discussion off the record.)

The Court: The Court excused Mrs. Mitchell from serving as a member of the jury, and will request Mrs. Ruby Lemmons, the alternate, to serve as a juror and to deliberate upon the evidence, because it is just the firm opinion of the Court that if we're going to have a knowledgeable jury, that we're going to have one that has not slept through the evidence."

Mrs. Mitchell was then excused from the jury. Mrs. Lemmons took her place as a regular juror, heard the instructions, listened to the closing arguments and joined in the verdict.

■ We first approach the problem of the propriety of the trial court in excusing juror Dorothy Mitchell from the jury panel and replacing her with an alternate. Section 494.065 [2] provides as follows:

"If in any case, civil or criminal, to be tried before a jury in a court of record, it appears to the court to be appropriate,

the court may direct that not more than four jurors in addition to the regular jury be called and impaneled to sit as alternate jurors. Alternate jurors, in the order in which they are called, shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. Alternate jurors shall be selected in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath and shall have the same functions, powers, facilities and privileges as the principal jurors. Alternate jurors who do not replace principal jurors shall be discharged after the jury retires to consider its verdict. Each side is entitled to one peremptory challenge in addition to those otherwise allowed by law if one or two alternate jurors are to be impaneled and two peremptory challenges if three or four alternate jurors are to be impaneled. The additional peremptory challenge may be used against an alternate juror only, and the other peremptory challenges allowed by law shall not be used against the alternates."

The record conclusively supports the trial court's finding that juror Dorothy Mitchell became unable to perform her duties as a juror by sleeping and napping in the jury box while evidence was being presented. Jurors determine facts from all of the evidence. They cannot determine facts from evidence they have not heard. The trial judge and the prosecuting attorney noted Mrs. Mitchell sleeping several times during the trial. This fact was sufficient justification to replace her with an alternate.

■ We next turn to the question of whether the trial court committed prejudicial error in denying defense counsel's challenge for cause of Mrs. Lemmons. It is clear that Mrs. Lemmons was not selected and summoned as a prospective juror in accordance with the procedures outlined in the statutes applicable to third and fourth

2. RSMo 1978, Supp.1982.

class counties, which Wright County is. It is also true that § 494.020 provides that any person not drawn and selected according to the applicable statutory provisions shall be ineligible to serve as a juror.

Mrs. Lemmons voluntarily appeared as a substitute juror for her husband, Orin. No question had been raised by Youngblood as to whether Orin's selection as a member of the jury panel was proper, so we assume that it was. There was nothing sinister in her appearing as a prospective juror in his place. In fact, her act in so doing was commendable under the circumstances. Be that as it may, was Youngblood prejudiced by Mrs. Lemmons being approved by the trial court as a substitute juror? Statutory provisions detailing the methods by which substitute or alternate jurors are obtained are directory, and unless a defendant demonstrates that he has been prejudiced by failure to follow those procedures, he is not entitled to relief. *State v. Friend*, 607 S.W.2d 902, 903 (Mo.App.1980).

■ Youngblood's attempt to show prejudice because Mrs. Lemmons' daughter was an employee of the Wright County Bank has no merit. During voir dire, Mrs. Lemmons said that such fact would not prejudice her, and there is nothing in the record to indicate otherwise. The trial court's decision that there had been no showing of bias and prejudice on the part of Mrs. Lemmons, and its denial of the challenge of her for cause, is supported by the record. Defendant's second and third points of claimed error are denied.

■ Defendant's remaining point is that the trial court committed prejudicial error by "overruling defendant's alternative motions first to dismiss (made March 6, 1981), or secondly to suppress evidence of test results obtained in absence of counsel at a

time when the defendant had been denied a phone call, because applicable law, including Missouri Rule of Criminal Procedure 31.01, as amended, provides that upon arrest the defendant shall promptly, upon request, be allowed the use of a phone to consult with attorney or others in his behalf, and defendant in this case was denied such right after request therefor, and such denial violated his right to due process of law and effective assistance of counsel, in that a right once conferred by statute or rule cannot be arbitrarily or capriciously denied."

This point does not say wherein and why the trial court erred [Rule 30.06(d)] or explain how defendant was prejudiced, if in fact he was denied a phone call. The record indicates that there was substantial evidence from which the trial court could find that he was not denied a phone call after his arrest. Tests that were made of his hands for dye stains, while he was in custody, were inconclusive and added nothing to the evidence against him.[3] There is nothing in the record to show that any evidence prejudicial to Youngblood was obtained from him during the period of time that he was in custody prior to the appointment of counsel for him.

Defendant cites no authority in the argument portion of his brief, and we know of none, which would justify the relief he requests under this point. The point is denied.

The judgment is affirmed.

FLANIGAN, P.J., and TITUS and CROW, JJ., concur.

---

3. The test for red dye stains was made because the bank teller had included in the robber's sack security packs, which are detonated when passed through an electrical field at the bank's front door, containing red dye and tear gas. After defendant's arrest, the prosecutor's investigator noticed a reddish substance beneath defendant's fingernails. The investigator wanted to conduct a red dye test before counsel was

appointed for defendant because this evidence, of a red dye which is easily washed off, could be quickly destroyed by the defendant. Defendant, however, chewed his fingernails off before the investigator could return with the test equipment. A few fingernail fragments on the floor near the defendant were collected, but there was not enough red dye found to make a comparison with the dye used by the bank.