

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD82819** |
| | ) | |
| v. | ) | **OPINION FILED: December 1, 2020** |
| | ) | |
| **JUSTIN ANDREW TODD,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Boone County, Missouri**
The Honorable Michael W. Bradley, Judge

Before Division Four:  Cynthia L. Martin, Chief Judge, Presiding, Karen King Mitchell, Judge and Anthony Rex Gabbert, Judge

Justin Andrew Todd ("Todd") appeals his convictions of one count of kidnapping in the first degree, two counts of rape in the first degree, and one count of sodomy in the first degree following a jury trial.  Todd asserts that the trial court erred in overruling his motion for a mistrial based on alleged juror misconduct, and in permitting the admission of testimony and an exhibit suggesting that Todd may have multiple personalities. Finding no error, we affirm.

## Factual and Procedural History

Todd does not challenge the sufficiency of the evidence to support his convictions of one count of kidnapping in the first degree, two counts of rape in the first degree, and one count of sodomy in the first degree. Viewed in the light most favorable to the verdict,[1] the evidence established that, in May 2017, M.M. ("Victim") was eighteen years old, lived in Mexico, Missouri, and worked at Walmart as a cashier. While working at Walmart, Victim met Danielle Todd ("Danielle"),[2] Todd's wife. Victim offered to babysit for Danielle's three children in the future.

On the evening of Friday, May 26, 2017, Victim went to Danielle's house in Mexico, Missouri to babysit the children. Danielle left, and while she was gone, Danielle contacted Victim to ask whether Victim could help move some boxes. Victim agreed. Danielle returned late Friday night or during the early hours of Saturday morning with a man Victim did not know. The man then stayed with Danielle's children, and Victim left with Danielle in a minivan. The passenger seat and the middle row of the minivan Danielle was driving were filled with large items, so Victim sat in the back seat of the minivan, next to Todd. Victim had never met Todd before, so Danielle introduced him to Victim. As Danielle started to drive away from her home, Victim put her hand down on the seat and felt a gun next to her. Todd told Victim that he used the gun for protection.

Victim noticed that Danielle was "kind of out of it" and was swerving all over the road. Danielle stopped at a gas station in Centralia, Missouri. Todd convinced Victim to

---

[1]We view the evidence in the light most favorable to the jury's verdict, disregarding all contrary evidence and inferences. *State v. Campbell*, 600 S.W.3d 780, 784 n.1 (Mo. App. W.D. 2020).
[2]Because Justin Todd and Danielle Todd share a surname, we refer to Danielle Todd by her first name for the purpose of clarity. No familiarity or disrespect is intended.

drive because he could not drive and Danielle did not seem able to drive. Victim initially told Todd that she was not comfortable driving at night, but she eventually relented. Neither Todd nor Danielle told Victim where they were going. Instead, Todd gave Victim directions while Todd and Danielle sat in the back seat of the minivan and giggled. Victim felt nervous and uncomfortable.

The trio eventually arrived at a trailer located in a trailer park on Brown Station Road in Columbia, Missouri. Kate Carter ("Carter"), a woman with whom Todd had a romantic relationship, lived in the trailer. However, Carter was not home, as she was working as a nurse that evening for Sleep Diagnostic Services in Wentzville, Missouri.

Victim did not know where she was or to whom the trailer belonged. Todd and Danielle exited the minivan. Victim stayed behind momentarily and sent messages to her friend, Eduardo Rodriguez Velez ("Rodriguez Velez"), because she felt uncomfortable and "had a really bad feeling." Those messages, sent around 4:20 A.M. on Saturday, May 27, 2017, alarmed Rodriguez Velez, so he forwarded the messages to Victim's mother, S.B. ("Mother"), and asked whether Mother had heard from Victim.

Victim got out of the minivan and went into the trailer, where she found Danielle lying on the couch. Victim checked on Danielle because she "seemed really out of it" and was not acting normally. Todd told Victim that the stuff that needed to be moved was in the back bedroom, located just off the kitchen. Victim went to the back bedroom, where she saw an animal cage, a bed, a chair, and a dresser. Todd told Victim that the items that needed to be moved were in the closet, and then left the room.

3

When Todd returned, he closed the door and was holding a gun behind his back. Victim asked what was going on. Todd then gave Victim a cup and told her to drink its contents or he would shoot her. Victim described the liquid inside the cup as appearing "cloudy," as if it contained crushed up pills. In an effort to avoid drinking the liquid, Victim lied, telling Todd that she was pregnant so that she needed to know what was in the cup. Rather than answer her question, Todd told Victim that the drink was his "own little concoction," and that it would be fine. Victim drank the liquid, which she described as tasting "chalky" and "gross."

Todd then forced Victim to lie on her stomach on the bed. Todd used zip ties to bind Victim's wrists behind her back and to bind her ankles together. Todd asked Victim what her biggest fear was. When Victim responded that her biggest fear was being killed, Todd told Victim that most people would say being raped. Todd then placed duct tape over Victim's mouth and around her head before leaving the room. While she was alone, Victim was able to remove the duct tape over her mouth using her teeth. Todd returned to the bedroom with a glass pipe. He lit the pipe and instructed Victim to inhale from the pipe three or four times. Todd told Victim to tell him when the effects of the smoke took effect, and left the room again. When Todd returned, he had Victim's cell phone and accused of her of revealing their location.

Todd then put Victim's head under a pillow and sat on top of her. Todd pulled down Victim's pants and inserted his penis into her vagina. Victim told Todd to stop and that she wanted to go home. Todd did not stop, and instead forced Victim to have vaginal intercourse while telling her that she was a good girl. While doing so, Todd had

4

a gun touching Victim's lower back and moved it down to Victim's anus. After forcing Victim to have vaginal intercourse, Todd pulled up Victim's pants and left the room to check on Danielle. When Todd returned to the bedroom, he removed the zip ties from Victim and helped her to the bathroom connected to the bedroom. Victim obeyed Todd's instruction to take a shower. While in the shower, Victim began feeling numb and had trouble breathing. Todd gave Victim a towel after she exited the shower. Todd gave Victim different clothes to wear and took Victim's clothes, telling her that he "wasn't going to get caught for anything."

Victim dressed and then, as instructed by Todd, sat on the bed. Todd placed zip ties on Victim's ankles again. Todd retrieved the glass pipe and forced Victim to inhale several more times while holding a gun to her head. Todd told Victim that he "wanted to make her tired." Todd then went to the sink, and when he came back, he took off one of Victim's socks and injected something into her foot. Todd poured the remaining liquid from the syringe into a cup and forced Victim to drink the liquid. Todd told Victim that the liquid would make her "forget everything." Todd told Victim to tell him when she started feeling the effects of the substances he had forced her to ingest. After drinking the liquid, Victim began to feel ill, like she was going to vomit. Todd gave Victim a trash can and, at her request, removed the zip ties.

Todd then had Victim sit on a chair in the bedroom, and told her that she would have to do it again. Victim protested, telling Todd that she could not. At that point, Todd held a gun to Victim's head, pulled down his pants, and put his penis in Victim's mouth. While Victim was no longer bound by zip ties, she felt like she could not move her body.

5

Todd then pulled Victim's pants down, and again he placed his penis in her vagina and forced Victim to have vaginal intercourse. Then Todd again ordered Victim to take a shower. After Victim followed his command, Todd placed Victim in zip ties again. Todd told Victim that "he wasn't a horrible guy." Victim responded by telling him that he had just raped her twice.

Throughout the evening of Friday, May 26, 2017, and into the early morning hours of Saturday, May 27, 2017, Todd had been sending text messages to Carter while she was at work. Todd told Carter that there was an emergency at her home and that she needed to return immediately. When Carter asked if it could wait until the end of her shift (at 6:30 on Saturday morning), Todd said that it could wait. Todd asked Carter "not [to] abandon him" and "not [to] forsake him." Todd told Carter that he needed her help and that he needed to know that she had his back. Carter responded that she did. Todd also sent a text message to Carter that asked whether phones keep records of text messages and told her that he was "involved in something bad" and that he "need[ed] a rescue."

At one point in his text messages to Carter, Todd stated that he was "Ash" and that he needed Carter's help. According to Carter, Todd claimed to have a multiple personality disorder and "Ash" spoke through Todd. Todd texted Carter to tell her that they would have "cleanup to do," and asked that Carter promise to help. She did. Later, Todd sent a text to Carter that said "[Oh my God] please hurry and [I']ve done something bad," and then asked her to tell him when she was on her way home. In the early morning hours of Saturday, May 27, 2017, Todd sent Carter a text message that said, "Ash fucked me over." Todd also told Carter to "think of his fantasy," and explained

6

"[t]hat's what your [sic] walking into." Carter asked Todd who Ash "fuck[ed] over," and Todd answered, "[p]retty much all of us." Later, Todd sent Carter a text message that read, "We could zi[p] tie her up and fuck," and another that said, "[s]he has to get to a certain point before we could [cut] her loose." Todd told Carter that he was grabbing Carter's taser "in case [he] need[ed] it."

After her shift ended at 6:30 A.M. on Saturday, May 27, 2017, Carter drove directly from her job in Wentzville to her home in Columbia. When Todd met Carter at the door, he was holding a small black handgun. Danielle was no longer in the trailer when Carter returned home.[3] Todd escorted Carter into the back bedroom, where Carter saw Victim sitting and wearing Carter's clothes, but Carter did not know why Victim was there. Carter did not believe that Victim was "in her right mind" because Victim was acting as though she was a cashier running a cash register. Carter described Victim's pupils as large. Carter asked Todd what was happening.

Todd ushered Carter into the kitchen, and told Carter that "he did not know what he had done to this lady." Todd explained to Carter that Victim was wearing Carter's clothes because she had soiled herself. Carter then went back into the bedroom to speak with Victim, but Carter had difficulty maintaining a conversation with Victim because Victim was not following along with the conversation. Carter did learn, however, Victim's name.

Carter and Todd decided that Todd and Victim would go with Carter to Wentzville that evening (Saturday, May 27, 2017), and that Todd and Victim would stay in a hotel

---

[3]The record does not indicate when Danielle left the trailer or where Danielle went when she left the trailer.

7

room while Carter worked overnight. Carter believed that Victim could use the time in the hotel room to sober up. Carter drove Todd and Victim to Wentzville in her truck. During the drive, Todd was quiet, but Victim was sweaty and her thoughts did not make sense. They checked into a hotel room once they arrived in Wentzville. While in the hotel room, Victim was hallucinating and talking nonstop without making sense.

Carter left the hotel room around 5:30 P.M. to go to work, and Todd and Victim stayed in the hotel room. Todd again forced Victim to drink a cup of chalky liquid that tasted terrible. Todd sent Carter multiple text messages while she was at work. One message included a rhyme that indicated "she" drank something and was inebriated. Carter understood that "she" referred to Victim. Carter felt nervous for Victim.

Mother attempted to contact Victim on the evening of Saturday, May 27, 2017, but phone calls went straight to voicemail, and Victim did not answer text messages. Mother received a text message from Victim's phone in the early morning hours of Sunday, May 28, 2017, that said, "With friends, call later." Mother thought the response was odd because Victim did not talk to her like that. Instead, Victim would typically write something like, "Mom, I know it's late, I'll give you a call in the morning. You're probably asleep."

After she finished her shift on the morning of Sunday, May 28, 2017, Carter went back to the hotel. She was relieved to find Victim alive. However, Victim "spoke in a manner that was not herself," and that "[s]he spoke like Ash" in that Victim was speaking more authoritatively and with more gusto. Victim said that "she preferred people with

8

[Todd's] personality disorder." Victim also referred to Todd as her brother Shawn, which seemed to irritate Todd.

The trio left the hotel and drove back to Carter's trailer in Columbia. When they arrived at the trailer, Todd asked Carter to stay in the front room while he and Victim went to the bedroom, where Todd used zip ties to attach Victim's hands to a pole by the bed. Danielle returned to the trailer while Carter was in the front room. Carter told Todd that she was not pleased that Danielle was in her home. Todd gave Carter two cell phones and asked her to throw the phones in a lake. Carter did not do as instructed. Instead, she hid the phones under a tree trunk. Carter then went to a nearby motel to meet a friend.

At approximately 11:00 A.M. on Sunday, May 28, 2017, Victim called Mother. Victim whispered that she was unable to tell Mother where and with whom she was. Victim was otherwise delusional during the phone call, telling Mother that she was with her brothers in a hotel in Columbia. Mother knew that was untrue because Victim's brothers were with Mother. Nonetheless, Victim told Mother that she would meet her at the Dairy Queen in Mexico, Missouri. Mother waited for two hours, but Victim never came. Instead, Victim was in the trailer with Todd. When Todd learned of Victim's conversation with Mother, he placed a gun to Victim's head and told her to cooperate.

Todd sent Carter a text message that warned Carter to be careful when she returned home because "some glass got broken in the st[r]uggle." Another text message from Todd indicated that he was "moving to a different site to finish the job." In particular, Todd indicated that they would be going to Truxton, Missouri, and Todd asked

9

Carter to "do a preliminary sweep" of the trailer, including the living room, bedroom, and bathroom, for "any incriminating stuff."

When Victim did not meet Mother at Dairy Queen as planned, Mother called the Mexico Police Department. Mother was informed that, because Victim was eighteen years old and Mother had spoken to her earlier that day, Mother could not report Victim as missing. Unsatisfied with that answer, Mother contacted the Columbia Police Department at approximately 3:00 P.M. on Sunday, May 28, 2017, because Victim had told Mother she was in a hotel in Columbia the previous night. Mother reported Victim missing because she had not heard from Victim in a couple days and Victim did not show up to work. The Columbia Police Department took a report and issued a be-on-the-lookout dispatch.

At approximately 4:15 P.M. on Sunday, May 28, 2017, Columbia Police Department officers were dispatched to an abduction call at Carter's trailer. Carter's next-door neighbor, John Snipes ("Snipes"), called 911 to report a possible abduction after he saw a woman lead another woman with a bandana around her eyes into a white van. Snipes saw Todd walk out of Carter's trailer with a duffle bag or backpack and climb into the passenger side of the van. The white van then drove away. Snipes wrote down the van's license plate and called 911. Maria Decarr ("Decarr"), Snipes's step-daughter, confirmed Snipes's account of what happened. Officers forced themselves into Carter's trailer. No one was there, but officers saw zip ties, a cut bra, and broken glass on the floor of the back bedroom.

10

After speaking with Snipes and Decarr, the police believed that Carter was the blindfolded woman, so they pinged Carter's cell phone to determine her location.[4] The police learned that Carter's cell phone was located at a motel near a truck stop just west of Columbia. Police immediately went to the motel where they found Carter, and learned she was not the blindfolded woman. After questioning Carter, however, they learned that Todd was in the van and was heading to Truxton, Missouri. Officers issued a "be-on-the-lookout" dispatch for Danielle's white van, and asked other agencies to stop the van to check the welfare of its occupants.

At approximately 6:00 P.M. on Sunday, May 28, 2017, Sergeant Jeff Scanlon ("Sergeant Scanlon") of the Warren County Sheriff's Department saw the white van in the parking lot of a truck stop just off Interstate 70 in Warren County, Missouri. Sergeant Scanlon made eye contact with the female driver of the van. As soon as Sergeant Scanlon did so, the driver, who was Danielle, started driving toward the parking lot's exit. Sergeant Scanlon stopped the van. He instructed Danielle to turn off the vehicle, and then instructed the two passengers sitting in the third row of the van--Todd and Victim--to put their hands on the glass. Once other officers arrived, Todd and Danielle were taken to the Warren County Sheriff's Department to wait for officers from the Columbia Police Department.

Victim was offered medical assistance at the scene, which she refused, so Victim was also taken to the Warren County Sherriff's Department to wait for Columbia Police

---

[4]Officer Justin Thomas of the Columbia Police Department described "pinging a phone" as a law enforcement tool used in emergencies to learn a cell phone's location using cell phone towers.

11

Department officers and her Mother to arrive. Victim looked as though she had not slept in several days and appeared mentally exhausted. While Victim was initially calm, she broke down crying once she was separated from Danielle and Todd, and she started telling officers what she had undergone. And while Victim seemed lucid, at times she hallucinated, including claiming to see Mother in the white van pointing and laughing at her. While waiting, Sergeant Scanlon took photographs of Victim's wrists because she said that she had been tied to Todd's bed and there were red marks on her wrists. Victim also told Sergeant Scanlon that she had been choked, so he took pictures of her upper chest and neck, which appeared to have red discoloration.

The white van was taken into police custody. Columbia Police Department officers later obtained a search warrant for the white van in question. During a search of the vehicle, officers found zip ties, wadded up duct tape with hair stuck to it, a bandana, blue jeans that appeared to have been cut along an inside seam, and scrubs wrapped in duct tape; a red backpack belonging to Todd containing a roll of duct tape, a package of syringes, Drano, a wallet containing a business card from a hotel located in Wentzville, additional zip ties, and a black H&K BB pistol with a magazine and a holster; and a green purse containing a white plastic vial containing white powder, four lighters, two knives, an open packages of syringes, a glass smoking device, and clear plastic capsules.

When Mother came to the Warren County Sheriff's Department to get Victim, she noted that Victim "looked horrible" in that her clothes were "disgusting," she was not wearing shoes, her hair was in disarray, her pupils were incredibly large, and she had marks on her wrists, ankles, and neck. Mother took Victim directly to University

12

Hospital in Columbia for an examination, including the completion of a rape kit, performed by a sexual assault nurse examiner, Meghan McGee ("McGee"), during the early hours of Monday, May 29, 2017. During her examination of Victim, McGee noted that that Victim had suffered the following physical injuries: petechiae[5] on the upper-posterior aspect of her neck, skin discoloration on the anterior aspect of her neck, ligature marks around her wrists and ankles, and bruising to the lateral aspect of her right foot. McGee noted that Victim had no needle marks or puncture wounds on her feet. McGee took samples of Victim's urine and blood, and took swabs of Victim's external genitals, cervix, and cervical pool as well as oral and buccal swabs.

The Missouri State Highway Patrol Crime Lab performed testing on the rape kit. Analysis of Victim's blood sample revealed that, at the time of collection, diphenhydramine, methamphetamine and amphetamine, and metronidazole were in her bloodstream. The urinalysis similarly revealed that Victim's urine contained diphenhydramine, tramadol, N-desmethyltramadol, and methamphetamine and amphetamine. While some of these substances found in Victim's blood and urine are depressants that would cause drowsiness, sluggish behavior, and disorientation, other substances acted as stimulants that would cause talkativeness, restlessness, agitation, euphoria, paranoia, delusions, and hallucinations. Analysis of the swabs taken during McGee's examination of Victim revealed the presence of seminal fluid on the swabs taken from Victim's cervix, posterior fourchette, labia majora, and labia minora. DNA

---

[5]McGee explained that petechiae is the medical term for "small areas of ruptured capillaries underneath the skin."

analysis determined that Todd was a major contributor to the DNA in the sperm fraction taken from the swab of Victim's cervix.

Officers from the Columbia Police Department executed a search warrant at Carter's trailer. During the search, officers found an empty zip tie package, used and unused zip ties, and a cut blue and white rope in the back bedroom; black zip ties, a wad of duct tape, and forty-one clear plastic capsules similar to those found in the white van in the kitchen trash can; fragments of broken glass in a hallway near an exterior door; and a capsule containing a yellow powdery substance inside a safe located in the residence.

The State charged Todd with one count of kidnapping in the first degree in violation of section 565.110[6] ("Count I") for unlawfully confining Victim for a substantial period without her consent by binding her with zip ties and duct tape with the purpose of inflicting physical injury on or terrorizing Victim; one count of rape in the first degree in violation of section 566.030 ("Count II") for knowingly having sexual intercourse with Victim by use of forcible compulsion; one count of sodomy in the first degree in violation of section 566.060 ("Count III") for knowingly having deviate sexual intercourse with Victim by inserting his penis into Victim's mouth while she was in a drug-induced state and therefore incapable of consent; and another count of rape in the first degree in violation of section 566.030 ("Count IV") for knowingly having sexual intercourse with Victim while she was in a drug-induced state and therefore incapable of consent.

---

[6]All statutory references are to RSMo 2016, as supplemented through the dates of the crimes, unless otherwise indicated.

After a four-day jury trial in February 2019, the jury returned its verdicts in just over two hours, finding Todd guilty of each charge. The trial court, which had previously found Todd to be a persistent misdemeanor offender pursuant to section 558.016, sentenced Todd to ten years' imprisonment for kidnapping, and to life imprisonment for each of the rape and sodomy counts, with all sentences to run consecutively to one another. Todd filed a motion for new trial, which the trial court denied.

Todd appeals.

## Analysis

Todd raises three points on appeal. In his first point on appeal, he challenges the trial court's decision to overrule his request for a mistrial based on alleged juror misconduct. Todd's second and third points on appeal concern the trial court's admission of evidence that Todd may have multiple personalities.

### *Point One: Refusal to Grant Mistrial*

Todd's first point on appeal asserts that the trial court abused its discretion in refusing to grant his request to discharge four jurors who were sleeping during the trial, which would have required a mistrial because too few jurors would have remained. Todd argues that the record "clearly show[s]" that Jurors 10, 26, 39, and 51 slept through parts of the trial so that they were not able to accurately assess the voluminous evidence presented. Todd claims that, by allowing jurors who slept during trial to stay on the jury, the trial court violated Todd's right to a fair trial, an impartial jury, and due process guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the United States

15

Constitution, and by Article I, sections 10 and 18(a) of the Missouri Constitution, and that these constitutional errors are structural in nature.

"[T]o prevail upon a claim of juror misconduct, it must be shown that the conduct was prejudicial to the defendant, and much lies in the discretion of the [trial] court." *State v. Whitman*, 788 S.W.2d 328, 337 (Mo. App. E.D. 1990) (citation omitted). "The trial court is in the best position to determine a juror's ability to effectively discharge his or her duties." *State v. Williams*, 427 S.W.3d 259, 264 (Mo. App. E.D. 2014) (quoting *State v. Rose*, 169 S.W.3d 132, 134 (Mo. App. E.D. 2005)). We will not disturb the trial court's ruling absent an abuse of discretion. *Id.* Todd has not sustained his burden to establish that the trial court abused its discretion in refusing to discharge jurors. Because it was not an abuse of discretion to refuse to discharge jurors at Todd's request, Todd's contention that the trial court would have been required to grant a mistrial after discharging four jurors is rendered moot.

During a break in Victim's testimony on the second day of trial, each of the two attorneys representing Todd informed the trial court that two jurors seemed to be asleep:

> Defense counsel no. 1: I just want to go ahead and make a record that a couple of the jurors seemed to be asleep. Number 39, his head sort of bounced down toward his chin, and Number 51 had his eyes closed for a lot of the time.
>
> Trial court: I noticed they had their eyes closed. I did not think they were asleep, but we'll have to . . .
>
> Defense counsel no. 2: 39 was definitely asleep. [Court reporter] is nodding her head. He was definitely asleep.
>
> Trial court: Will you put on the record what you saw?

16

Court reporter: I saw Number 39 bob his head, and it jerked like you're falling asleep.

Defense counsel no. 1: I also saw Number 51 with his eyes closed, but he was like most of that yesterday, like he sits and thinks with his eyes closed. I tried to keep my eyes on if he was just resting their eyes or thinking, and then they'd perk back up and it wasn't a concern. But those two specifically 39 and 51.

Juror 51 was already one of the alternate jurors. The trial court's solution was to take no action at the time, but instead to make Juror 39 the second alternate when the jury retired for deliberation.

Defense counsel again raised concerns about jurors sleeping on the third day of trial:

Defense counsel no. 1: And Your Honor, I'm just wanting to make a record that Jurors Number 10 and 26, who are different jurors than yesterday, were both sleeping during different points of the testimony. Juror Number 26, [I] kept seeing her head again kind of fall down and towards her chest. . . . Juror 10, her head kept falling down. Juror 26, her head kept falling back and at one point I was watching her breathe and she was taking really deep, even breaths like she was asleep, and her eyes were closed at that time.

Trial court: Okay. I've been watching. I'm not specific on those two jurors. I've been watching them and I've counted, they all seem to be coming back before I can count to ten, so that's kind of been my handle on it. So what's your request going to be with the sleeping jurors?

Defense counsel no. 1: With the sleeping jurors, the fact that there's four of them is troublesome, but I'm going to be asking to strike all of the ones that have been missing the evidence.

Trial court: If you strike all of them, I'm declaring a mistrial.

Defense counsel no. 1: I understand that.

Trial court: Are you asking to strike all four of them?

Defense counsel no. 1: I am.

Trial court: Okay. What's the State's position?

17

State: I have not witnessed it, Your Honor, so I mean, we want to finish this trial. But I feel at a loss. I have not witnessed jurors sleeping. The moments I've looked at the jury, they've all been awake and I've found to be attentive.

Defense counsel no. 2: Your Honor, if I may, during the video in particular, I know we talked about Juror 39 sleeping yesterday.

Trial court: Uh-huh.

Defense counsel no. 2: We had already decided that he would be an alternate, but during the video, a great portion of it, both Juror 29[7] and 10 slept through a great portion of it. And then after the video concluded and the State was going through all of the evidence on the back bench there, both Juror 26 and 10 continued to sleep. It wasn't just for brief moments here and there, but for a huge portion of the video shown, they were sleeping.

Trial court: Okay. Let's do this. . . . Which of the jurors do you wish to question?

Defense counsel no. 1: Today, it was 26 and 10. Yesterday it was 39 and 51.

Defense counsel No. 2: Correct.

The trial court separately brought each of the four jurors who were allegedly sleeping during trial into the courtroom to question them. In response to the trial court's questions, Juror 10 admitted that she "probably nodded here and there," but she said that "[couldn't] promise that [she] fell asleep because [she felt] like [she] heard everything" and that, to her knowledge, she had not missed anything. Juror 26 stated that she had not fallen asleep and instead was merely listening with her eyes closed. Juror 39 indicated that, on a couple occasions, he may have "dozed off for just a second" before catching himself. Juror 39 did not believe that he had missed any testimony. Juror 51 stated that

---

[7]The transcript indicates that defense counsel no. 2 referenced juror 29 even though juror 29 is not otherwise mentioned in the discussion of sleeping jurors. It is not apparent from context whether defense counsel no. 2 was intending instead to refer to juror 26 or juror 39.

she had not fallen asleep and instead put her head down because it helped her hear better. Defense counsel, despite being given the opportunity to do so by the trial court, did not question any of the four jurors. The trial court denied Todd's request to discharge any of the jurors. As a result, there was no need for the trial court to consider whether to declare a mistrial.

This was not an abuse of discretion. Juror 51 was seated as an alternate juror, and based on defense counsel's initially expressed concern about Juror 39, that juror was made an alternate as well. Neither party objected to Juror 39 being removed from the jury and made an alternate. Regardless, neither Juror 39 nor Juror 51 participated in the jury's deliberations. Their service as alternate jurors who did not participate in deliberations could have not prejudiced Todd, even if they were sleeping during the trial. *See Whitman*, 788 S.W.2d at 337 ("In order to prevail upon a claim of juror misconduct, it must be shown that the conduct was prejudicial to the defendant . . . .").

With respect to Jurors 10 and 26, the trial court was able to observe whether those jurors were attentive during trial. Though the trial court observed jurors closing their eyes during trial, on each occasion the subject juror opened his or her eyes before the trial court could count to ten. Despite no observed concerns with Jurors 10 and 26, the trial court questioned both jurors. Both Jurors 10 and 26 admitted that they had closed their eyes during the trial. Juror 10 told the trial court that she probably nodded off a few times, but believed she had heard all of the evidence. At most, Juror 10 confessed to a lapse of attention, which is not grounds to remove a juror. *See Whitman*, 788 S.W.2d at 337 ("A lapse of attention is not grounds to remove a juror for sleeping."). Juror 26 said

19

that she was listening to the evidence with her eyes closed, and never dozed off. It was well within the trial court's sound discretion to conclude, based on its own observations of the jury and based on testimony from the jurors in question, that the behavior of Jurors 10 and 26 did not warrant disqualification from the jury and thus did not warrant declaring a mistrial.

As a result, the circumstances in this case are distinguishable from those in *State v. Youngblood*, 648 S.W.2d 182 (Mo. App. S.D. 1983), on which Todd relies to claim error based on the refusal to discharge jurors. In *Youngblood*, the trial court discharged a juror after the juror was observed sleeping while evidence was being presented. *Id.* at 188. The Southern District affirmed the trial court's decision, reasoning that "[jurors] cannot determine facts from evidence they have not heard." *Id.* Here, however, the trial court determined that Jurors 10 and 26 were not sleeping through the presentation of evidence. *Youngblood* does not alter our decision, and merely reinforces that a trial court's determination of whether juror misconduct has occurred sufficient to warrant ameliorative action is subject to review for abuse of discretion.

Todd's reliance on section 494.485 to support his claim of error is also not persuasive. Section 494.485 provides:

> If in any case to be tried before a jury it appears to the court to be appropriate, the court may direct that a number of jurors in addition to the regular jury be called and impaneled to sit as alternate jurors. Alternate jurors, in the order in which they are called, shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. Alternate jurors shall be selected in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath and shall have the same functions, powers, facilities and privileges as the

20

principal jurors. Alternate jurors who do not replace principal jurors shall be discharged after the jury retires to consider its verdict. Each side is entitled to one peremptory challenge in addition to those otherwise allowed by law for each two alternate jurors to be impaneled. The additional peremptory challenge may be used against an alternate juror only, and the other peremptory challenges allowed by law shall not be used against the alternates.

"Section 494.485 regulates the jury process in a manner consistent with the constitutionally mandated unanimous verdict," and failure to comply with the statute is reversible error. *State v. Amick*, 462 S.W.3d 413, 416 (Mo. banc 2015). Todd's contention that section 494.485 was violated is necessarily limited to the trial court's recasting of juror 39 from a principal juror to an alternate, as there is nothing about the initial designation of jurors 10 and 26 as principal jurors, or of juror 51 as an alternate juror, that can be said to violate section 494.485.

Todd's contention that section 494.485 was violated when the trial court replaced juror 39 with an alternate juror and then made juror 39 an alternate juror (in lieu of discharging juror 39) is not preserved for our review. Todd did not object at trial to the manner in which the trial court resolved his complaint about juror 39. At best, Todd's claim on appeal that the trial court violated section 494.485 when it recasting juror 39 as an alternate is subject to plain error review. Under that standard of review, even if we assume, *arguendo*, that a trial court has no authority under section 494.485 to remove a juror as a principal juror and to instead make the juror an alternate, Todd cannot establish that he suffered manifest injustice or a miscarriage of justice. As explained, *supra*, juror 39 did not deliberate in his case. Though juror 39 arguably should have been discharged outright, and not recast as an alternate, any error was not prejudicial to Todd.

21

Point One is denied.[8]

## *Points Two and Three: Admission of Evidence*

Todd's second and third points on appeal concern the admission of evidence suggesting that Todd claimed to suffer from multiple personalities. In his second point on appeal, Todd argues that the trial court abused its discretion is allowing Carter to testify that Todd may have multiple personalities. Todd's third point on appeal asks us to conclude that the trial court plainly erred in admitting parts of State's Exhibit 145A, printouts of the text messages sent between Todd and Carter, because that exhibit allowed the jury to hear that Todd may have a multiple personality disorder. Todd asserts that the evidence about his multiple personalities was highly prejudicial, and thus not legally relevant, because it portrayed him as someone who is disturbed. Todd claims that, had this testimony and evidence not been admitted, he would not have been convicted of Counts III and IV.[9]

The trial court has broad discretion in choosing to admit or exclude evidence. *State v. Wilson*, 602 S.W.3d 328, 332 (Mo. App. W.D. 2020). As such, we review preserved errors regarding the trial court's decision either to admit or exclude evidence for an abuse of discretion. *Id.* A trial court abuses its discretion "when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of

---

[8]Because the trial court did not abuse its discretion in refusing to discharge Jurors 10 and 26, and because Todd suffered no prejudice as a matter of law as Jurors 39 and 51 did not deliberate, we need not address Todd's contention that the refusal to discharge these jurors constituted constitutional error that was structural in nature. We observe, however, that Todd cited no authority for this proposition. *See State v. Steidley*, 533 S.W.3d 762, 778 (Mo. App. W.D. 2017) ("Mere conclusions and the failure to develop an argument with support from legal authority preserve nothing for review." (quoting *Kimble v. Div. of Emp't Sec.*, 388 S.W.3d 634, 641 (Mo. App. W.D. 2013))).

[9]Todd acknowledges that the evidence supporting Todd's guilt of Counts I and II arguably was overwhelming, so he focuses his discussion of prejudice on Counts III and IV.

22

careful consideration." *State v. Marshall*, 596 S.W.3d 156, 158-59 (Mo. App. W.D. 2020) (quoting *State v. Suttles*, 581 S.W.3d 137, 145 (Mo. App. E.D. 2019)). "Our review is for prejudice, not error alone; and we 'will reverse only if the error was so prejudicial it deprived the defendant of a fair trial.'" *Wilson*, 602 S.W.3d at 332 (quoting *State v. Hein*, 553 S.W.3d 893, 896 (Mo. App. E.D. 2018)). An error is prejudicial if there is a reasonable probability that, but for the trial court's error, the result of the trial would have been different. *Id.*

If a defendant fails to object to the admission of evidence at trial, however, we have discretion to review the alleged error for plain error "affecting substantial rights" if we conclude that a "manifest injustice or miscarriage of justice has resulted therefrom." Rule 30.20.[10] Plain error review is a two-step process. *State v. Garretson*, 598 S.W.3d 643, 649 (Mo. App. W.D. 2020). First, we must determine whether the claimed error "facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." *Id.* (quoting *State v. Baumruk*, 280 S.W.3d 600, 607-08 (Mo. banc 2009)). In other words, the alleged plain error must be "evident, obvious, and clear." *Id.* (quoting *Baumruk*, 280 S.W.3d at 607-08). If we find the error was evident, obvious, and clear, then we proceed to the second step: determining whether the error resulted in a manifest injustice or a miscarriage of justice. *Id.* (citing *Baumruk*, 280 S.W.3d at 607-08).

Prior to trial, Todd filed a motion in limine that sought to exclude evidence at trial that established he had a multiple personality disorder and evidence that, at some point,

---

[10]All Rule references are to the Missouri Supreme Court Rules (2020), unless otherwise indicated.

Todd was possessed by a demon. Todd argued that this evidence would not be legally relevant because its probative value would be outweighed by its prejudicial impact. The State responded that it would be unable to introduce evidence of the text message discussions between Carter and Todd without explaining that references to "Ash" and "Jay" committing crimes or engaging in wrongdoings were, in fact, references to Todd. The State also argued that the text messages amounted to Todd's admissions that he committed the offenses, albeit in a manner that tried to explain and justify his behavior. The State assured the trial court that it would not be arguing that Todd suffers from a multiple personality disorder, and that it did not intend to put on any psychiatric testimony. Todd's counsel suggested to the trial court that the witness simply say that Todd referred to himself as "Ash" and as "Jay." The trial court granted the motion to exclude the terms "multiple personality disorder" and "demon possession" from the evidence at trial, but otherwise deferred its ruling on admissibility of the text messages and of Carter's testimony about the text messages.

At trial, Carter testified that when she returned to the hotel on Sunday, May 28, 2017, Victim "spoke in a manner that was not herself." When asked by the State to explain, Carter said that Victim "spoke like Ash." The State then asked, "And what does that mean?" Defense counsel objected, raising the issue presented in Todd's motion in limine. After hearing arguments from counsel, the trial court concluded that it would allow Carter could testify about Todd's statements to her because the evidence went to Todd's mental state, and permitted Carter to explain her testimony that Victim was acting as though she was possessed by "Ash."

24

Carter then testified that Victim sounded like "Ash" in that Victim spoke with "more authority or more gusto." Carter testified that Victim said that "she preferred people with [Todd's] personality disorder." Carter explained that Todd had previously told her that he had a multiple personality disorder and that he may not seem like himself at times. Carter testified that, when Todd refers to himself as Ash, he would be more authoritative than usual.

During Carter's testimony, the State attempted to introduce State's Exhibit 145A, a printout of text messages between Todd and Carter during the weekend of Friday, May 26, 2017, to Sunday, May 28, 2017. Defense counsel objected on the basis of foundation. The trial court overruled the objection and admitted the exhibit into evidence.

Carter then testified about the content of the text messages without further objection. The text messages between Todd and Carter indicated that Todd was in trouble and needed Carter's help. Among other things, Todd told Carter, "This is Ash." Carter testified without objection that "Ash speaks through [Todd]." Later in the text conversation, Todd told Carter, "[Oh my God] please hurry and [I']ve done something bad," followed by "[t]ell me your [sic] on your way." Todd sent another text message that said "Ash fucked me over" which, according to Carter, meant that Todd was himself again. Todd sent Carter text messages that said, "Think of his fantasy," and "That's what your [sic] walking into." Carter sent a text message to Todd asking "Who did he fuck over?" and Todd responded, "Pretty much all of us." Todd also sent Carter a message that said, "i m jay," and then other messages that said, "I just came to this shit." and "It's nuts." Carter identified "Jay" as another one of Todd's personalities.

25

Todd's second and third points on appeal challenge the legal relevance of Carter's testimony, and the content of Exhibit 145A, referencing Todd's multiple personalities. To be admissible, evidence must be both logically and legally relevant. *State v. Taylor*, 588 S.W.3d 632, 638 (Mo. App. W.D. 2019). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." *Id.* (quoting *State v. Prince*, 534 S.W.3d 813, 817 (Mo. banc 2017)). Legal relevance, on the other hand, "weighs the probative value of the evidence against its costs--unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id.* (quoting *State v. Prince*, 534 S.W.3d 813, 818 (Mo. banc 2017)). If the potential prejudice of the evidence outweighs its probative value, then the evidence should be excluded. *Id.*

Todd's argument that the contested evidence was not legally relevant is premised on a contention that evidence he claimed to have multiple personalities had no probative value. In other words, although Todd does not argue that the evidence in dispute was not logically relevant, he effectively contends as much by arguing the prejudicial value of the evidence outweighed its probative value because it had no probative value. We disagree.

Carter's testimony was logically relevant to explain that Todd, not third persons named "Ash" and "Jay," sent all of the text messages from Todd's phone to Carter over the weekend in question, and thus all of the text messages in State's Exhibit 145A. The text messages and Carter's explanation of the text messages was also logically relevant to establish that Todd engaged in the conduct that led to him being charged with kidnapping, rape, and sodomy. Portions of the evidence were also logically relevant to

26

show Todd's consciousness of guilt and his desire to conceal his offenses. *See State v. Barton*, 998 S.W.2d 19, 28 (Mo. banc 1999) ("Conduct and declarations of a defendant that are relevant to show a consciousness of guilt or a desire to conceal the offense are admissible because they tend to establish the defendant's guilt of the charged crime."). Some of the text messages established that Todd asked Carter whether phones keep records of text messages; established that Todd knew he was "involved in something bad," and that he "need[ed] a rescue" from Carter; established that "Ash" had "fucked [Todd] over" by acting on "his fantasy"; established that Todd asked Carter if he could "play with her," and suggested that they "could zi[p] tie her up and fuck," presumably referring to Victim in each instance; established Todd's awareness of Victim's intoxication, including his characterization of Victim as "a corpse," and his recognition that Victim "has to get to a certain point before [they] could [cut] her loose"; established that Todd knew that they "[had] to move you know who somewhere," and that he was "moving to a different site to finish the job"; and established that he asked Carter to "do a preliminary sweep of the living room[,] our room[,] and bathroom for any incriminating stuff."

We therefore reject Todd's contention that Carter's testimony and State's Exhibit 145A were not legally relevant because the evidence was logically relevant. Beyond this flawed analysis, Todd asserts that evidence that he purportedly had multiple personalities "only served to inflame the passions of the jury against [Todd] and to encourage them to punish him for being a person who was generally of bad moral character or 'dangerous'" despite the absence of any evidence from a mental health professional diagnosing Todd

27

with a mental health condition. [Appellant's Brief, pp. 52-53, 61] However, the State was not attempting to demonstrate that Todd had multiple personalities and had no obligation to do so. Instead, the State intended only to establish that Todd claimed to have multiple personalities in an effort to diffuse responsibility for his actions. We fail to see how this evidence was unduly prejudicial. It is, instead, highly probative of issues in dispute in the case. The trial court was in the best position to weigh the potential prejudicial effect of Carter's testimony and State's Exhibit 145A against its probative value. *See State v. Thompson*, 489 S.W.3d 312, 324 (Mo. App. W.D. 2016). We cannot conclude that the trial court abused its discretion, much less committed plain error, in concluding that the evidence was more probative than prejudicial.[11]

Points Two and Three are denied.

### Conclusion

The Judgment is affirmed.

Cynthia L. Martin

Cynthia L. Martin, Judge

All concur

---

[11]Todd devotes much of his discussion of Points Two and Three to an argument that the trial court's admission of the evidence was not harmless error because the evidence supporting the jury's verdicts for and subsequent convictions of Counts III and IV was not overwhelming. Because we conclude that the trial court did not abuse its discretion or commit plain error in admitting the evidence in question, we do not reach the issue of whether the evidence supporting Todd's convictions for Counts III and IV was overwhelming.